COURT OF APPEALS
DECISION
DATED AND FILED

October 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2019AP1409-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017CF178

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

　　PLAINTIFF-RESPONDENT,

V.

CHANLER LEE GUYTON,

　　DEFENDANT-APPELLANT.

　　　APPEAL from a judgment of the circuit court for Door County: DAVID L. WEBER, Judge. *Affirmed.*

　　　Before Stark, P.J., Hruz and Seidl, JJ.

　　¶1　SEIDL, J.  Following a bench trial, Chanler Guyton was convicted of five counts of threats to a witness, as a repeater.  Guyton now appeals his judgment of conviction, arguing that there was insufficient evidence to support the circuit court's guilty verdicts.  More specifically, Guyton argues the State failed to

present sufficient evidence to prove that: (1) two of the five victims met the applicable statutory definition of a "witness"; (2) Guyton knew or had reason to know that the five victims were witnesses; and (3) Guyton threatened the five victims because they were witnesses. We reject these arguments and affirm.

## BACKGROUND

¶2    A criminal complaint charged Guyton with five counts of threats to a witness, contrary to WIS. STAT. § 940.201(2) (2017-18).[1]  The charges stemmed from an allegation that Guyton had threatened five Door County Department of Human Services (the Department) employees—McKayla, Debra, Chloe, Barb, and Ali.[2]  After Guyton waived his right to a jury trial, the matter proceeded to a bench trial.

¶3    McKayla testified that, as part of her duties as a social worker for the Department, she had been assigned to a Child in Need of Protection and/or Services (CHIPS) case involving Guyton's son.  McKayla stated that she was assigned to this case in its postdispositional phase, and that she inherited the case from Ali.

¶4    At the time McKayla was assigned the CHIPS case, Guyton was incarcerated at the Door County Jail.  McKayla met with him on a monthly basis to discuss the case, and Guyton was initially permitted to speak with his son on the

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4), we use pseudonyms to refer to the victims in this opinion.

2

telephone. Guyton was not authorized, however, to have in-person visits with his son.

¶5 McKayla stated that her meetings with Guyton were "usually hostile." She explained that Guyton expressed his disagreements with the decisions the Department was making regarding the case. Guyton also sent a number of written complaints about the Department's handling of his son's case to McKayla's supervisor, Debra, and the Department's deputy director, Chloe.

¶6 McKayla testified that on July 18, 2017, she called Guyton to inform him that the Department was suspending his authorization to make phone calls to his son. The reason for this suspension was that the Department and the Sturgeon Bay Police Department were both investigating new allegations that Guyton had abused his son. When McKayla informed Guyton about the suspension, he became "hostile" and "loud." McKayla stated he then made the following threat:

> I'm going to deal with this with my own hands when I get out of here. Everyone who has touched the case is going to pay for this. [McKayla, Barb, Ali, Debra, and Chloe]. This is going to turn very tragic, and this will be the sickest thing that Door County has ever seen before. I am going to come to your office for you armed. You violated my rights, now I am going to violate yours. I will be out in six months and will be taking this into my own hands then.[3]

McKayla told Guyton she would need to report this threat to her supervisor, to which he responded that he did not care.

---

[3] McKayla testified she took notes of the phone call with Guyton, and that her notes reflected that Guyton made this threat "verbatim."

3

¶7      McKayla also testified that, like in any other case involving the out-of-home placement of a child, there was a potential that Guyton's son's CHIPS case could progress to a termination of parental rights (TPR) case. She stated that if that happened, she believed she would be called as a witness. She explained that as "the ongoing case manager [she] would be filing the [TPR] paperwork and likely testifying to that documentation."

¶8      In addition, McKayla detailed the allegations of abuse that prompted the Department to suspend Guyton's phone calls with his son. She explained that Guyton's son had disclosed allegations of abuse to his therapist, who in turn had informed McKayla about the allegations. McKayla believed that if charges were filed based on these new allegations, she would have been called as a witness in the criminal proceedings.

¶9      Debra testified that she worked in a management position at the Department. She stated that she first became aware of Guyton's case when he was arrested in December 2016 and the Department needed to find a place for his son to live. Her involvement in the case included approving various social workers' decisions, and she also personally performed a "home visit" and a "relative visit" during the search for a potential placement for Guyton's son. She explained that, as a manager, this level of involvement was higher than what she would have in an "average" case. However, "due to the location and the number of staff we have in our department, it just made more sense" for her to perform these tasks for this particular case.

¶10     Ultimately, the Department placed Guyton's son with the child's maternal grandmother. Debra stated Guyton was not happy with this decision, and he wrote her at least eight letters criticizing the Department's actions. Debra

testified that, given her involvement in Guyton's case, she believed she could be called as a witness at either a postdispositional CHIPS hearing or a TPR proceeding.

¶11    Chloe testified that she served both as the deputy director for the Department and in the "role of grievance examiner." In the latter role, she acted as the "first line" in reviewing complaints made against the Department's employees. Pursuant to this duty, Chloe received, and responded to, multiple written complaints from Guyton regarding the Department's handling of his son's case. Responding to these letters required Chloe to speak with the Department employees handling the case. As a result, she had more involvement in Guyton's case than she would have had with an average case.

¶12    Chloe stated that it would be uncommon for her to be called as a witness in a CHIPS proceeding. Nonetheless, she believed it would be possible for her to be called to testify in a postdispositional CHIPS hearing or TPR proceeding involving Guyton because of her "involvement in the complaints."

¶13    Barb testified that she was a social worker when Guyton made his threat to McKayla. She was familiar with the case because she had been assigned, in June 2017, to investigate the statements Guyton's son had made involving "past physical discipline and fear of his father." She also had investigated a prior "referral" against Guyton, during which she "spoke with him over the phone and he refused to meet." Given her investigations, she believed it would not be uncommon for her to be called as a witness at a postdispositional CHIPS hearing or TPR proceeding involving Guyton.

¶14    Ali testified that she was a social worker assigned to the CHIPS case involving Guyton's son in January 2017. She prepared and presented a

dispositional report to the circuit court as part of those proceedings. She also testified both at the dispositional hearing and at a temporary placement hearing for Guyton's son.

¶15     After the State rested its case, defense counsel moved for a directed verdict. As relevant here, counsel first argued that the State had to show that the individuals Guyton threatened had "attended a proceeding to testify or [had] testified" to prove that the threatened individuals were witnesses within the meaning of WIS. STAT. § 940.201(2). Because only Ali had actually testified in one of Guyton's cases, counsel argued the other four victims were only "hypothetically" witnesses.

¶16     In addition, Guyton's counsel argued that the State had failed to show that Guyton knew or had reason to know that the threatened individuals were witnesses within the meaning of WIS. STAT. § 940.201(2). Finally, counsel argued the State had failed to show that the threatened individuals' statuses as witnesses caused Guyton to make his threats.

¶17     The circuit court denied Guyton's motion for a directed verdict. The court first determined that under *McLeod v. State*, 85 Wis. 2d 787, 790, 271 N.W.2d 157 (Ct. App. 1978), the definition of a "witness" for purposes of WIS. STAT. § 940.201(1) included a prospective witness. Regarding Guyton's latter two arguments, the court concluded the State had established a "prima facie case" that Guyton knew or had reason to know the threatened individuals were witnesses and that he threatened them because they were witnesses.

¶18     Guyton testified in his own defense. He explained that when he was arrested in December 2016, he had custody of his son. He acknowledged that he was angry about the Department's subsequent placement of his son with the

6

child's maternal grandmother, and that he wrote letters to the Department to complain about that decision. He stated that he had planned to file a civil suit against the Department's employees, but that his research revealed that he "only had a certain amount of time to pursue this lawsuit" and that the relevant time period had passed. After his release from incarceration, Guyton planned to work to regain custody of his son.

¶19 Guyton acknowledged that McKayla's testimony regarding the substance of his statements during the July 18, 2017 phone call was accurate. He claimed he made his statements out of anger, and that they were not a serious threat to harm the employees. Guyton did expect, however, that his threat would cause the Department employees to stop "harassing" him.

¶20 Guyton stated he was aware that the Department employees might testify in a CHIPS proceeding related to his son. He also recognized that when he "had an objection to some change" the Department would make in his son's CHIPS proceeding, his objection could result in a court hearing being held. Moreover, Guyton acknowledged that at such a hearing the Department employees might give testimony justifying the reason for the change to which Guyton objected.

¶21 After the parties submitted written closing arguments, the circuit court found Guyton guilty on all five counts in an oral decision. The court imposed sentences consisting of three years' initial confinement and three years' extended supervision on each count, concurrent to each other and consecutive to any other sentence. This appeal follows.

**DISCUSSION**

## I. Standard of review

¶22    On appeal, Guyton argues the State failed to present sufficient evidence to prove that: (1) two of the five victims (Debra and Chloe) met the statutory definition of a witness; (2) Guyton knew or had reason to know that any of the five victims were witnesses; and (3) Guyton threatened the five victims because they were witnesses. "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law, subject to our de novo review." *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. Our review is "highly deferential." *See State v. Rowan*, 2012 WI 60, ¶26, 341 Wis. 2d 281, 814 N.W.2d 854. Applying that deferential standard, we will affirm a conviction unless the evidence, viewed most favorably to the State, "is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See State v. Booker*, 2006 WI 79, ¶22, 292 Wis. 2d 43, 717 N.W.2d 676 (citation omitted).

## II. Sufficiency of the evidence

¶23    In this case, the circuit court could find Guyton guilty of threats to a witness only if the State proved beyond a reasonable doubt that: (1) he threatened to cause bodily harm to the victim; (2) the victim was a witness; (3) he knew or had reason to know that the victim was a witness; (4) he threatened to cause bodily harm to the victim because the person attended or testified as a witness; (5) he threatened bodily harm without the victim's consent; and (6) he acted

8

intentionally.[4]  *See* WIS JI—CRIMINAL 1238.  As Guyton challenges the sufficiency of the State's evidence only as to the second, third, and fourth elements, we limit our discussion to those elements.

### A.  Second element

¶24    We begin with Guyton's argument concerning the second element—i.e., whether the victim was a witness.  WISCONSIN STAT. § 940.201(1)(a) provides that "witness," for purposes of the statute, has the meaning given in WIS. STAT. § 940.41(3).  That statute, in turn, defines witness to mean

> any natural person who has been or is expected to be summoned to testify; who by reason of having relevant information is subject to call or likely to be called as a witness, whether or not any action or proceeding has as yet been commenced; whose declaration under oath is received as evidence for any purpose; who has provided information concerning any crime to any peace officer or prosecutor; who has provided information concerning a crime to any employee or agent of a law enforcement agency using a crime reporting telephone hotline or other telephone number provided by the law enforcement agency; or who has been served with a subpoena issued under s. 885.01 or under the authority of any court of this state or of the United States.

Sec. 940.41(3).

¶25    Guyton argues the State failed to present sufficient evidence to prove beyond a reasonable doubt that Debra and Chloe met this definition.  He reasons that because WIS. STAT. § 940.41(3) refers to a person who is "expected to be summoned to testify," the State needed to produce evidence "that there was or

---

[4] We observe that the State makes an argument that the fourth element listed in WIS JI—CRIMINAL 1238 does not apply to the facts of this case.  For the reasons explained below, we reject that argument.

would be any postdispositional hearing in the CHIPS case" to satisfy this element as to Debra and Chloe.

¶26 The State responds that Guyton conceded below that the second element was satisfied and therefore he cannot now raise this argument on appeal. In support of its concession argument, the State points to Guyton's written closing argument, where he stated that "[t]here is little dispute that the named victims meet the definition of witness under the jury instruction" and that "it is possible that in the context of their work, [the victims] would have relevant information to Mr. Guyton's CPS [Child Protective Services] matter and be called as witness[es]."

¶27 The State further argues that Guyton's argument "that the State was required to prove that [Debra and Chloe] were 'expected' to testify … ignores the second definition of a witness" set forth in WIS. STAT. § 940.41(3). Put differently, the State argues that the portion of § 940.41(3) that defines a witness as a person "who by reason of having relevant information is subject to call or likely to be called as a witness" is not modified by the word "expected," which appears earlier in the statute.

¶28 We conclude that Guyton affirmatively waived his right to argue that the State produced insufficient evidence to prove that Debra and Chloe were witnesses by expressly conceding that argument below.[5]  A defendant may waive

---

[5] We note that in *State v. Hayes*, 2004 WI 80, 273 Wis. 2d 1, 681 N.W.2d 203, our supreme court held that a defendant's "challenge to the sufficiency of the evidence" was not subject to the "waiver" rule. *See id.*, ¶¶4, 21.  In so holding, the *Hayes* court made clear that its reference to the "waiver" rule referred to situations where a defendant failed to make an objection at all in the circuit court. *See id.*, ¶¶4, 21, 40.

(continued)

an appellate argument by making a directly contradictory argument in the circuit court. *See State v. Thexton*, 2007 WI App 11, ¶6, 298 Wis. 2d 263, 727 N.W.2d 560 (2006).

¶29 We conclude that application of the waiver rule is warranted in this case because, based on Guyton's concession, the circuit court limited its discussion of the second element in its oral decision pronouncing its verdicts to the following: "The defense concedes that under a liberal definition of 'witness,' the victims in this case were witnesses."[6] Thus, Guyton's concession deprived the circuit court of the ability to make a specific finding regarding the sufficiency of the evidence on the second element. Stated differently, if the court did make any error, that error was invited by Guyton. We will not review invited error. *Shawn B.N. v. State*, 173 Wis. 2d 343, 372, 497 N.W.2d 141 (Ct. App. 1992).

### B. Third element

¶30 Turning to the third element, Guyton argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that Guyton knew,

---

After the *Hayes* decision, our supreme court recognized that although some of its previous decisions had used the terms "waiver" and "forfeiture" interchangeably, "the two words embody very different legal concepts." *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612. The *Ndina* court then clarified that the term "forfeiture" is appropriate where a party fails to make a timely assertion of a right, whereas "waiver" is appropriate where a party affirmatively relinquishes or abandons a right. *Id.*

Thus, even though the *Hayes* court used the term "waiver," the legal concept it actually addressed was the doctrine of forfeiture—because that case concerned a party's failure to timely raise a sufficiency of the evidence argument. As that doctrine does not apply to the facts of this case, *Hayes* does not control our analysis.

[6] In his reply brief, Guyton argues that that we should ignore his concession because "a finder of fact could reject any concession by counsel during a trial." This argument ignores the fact that, in this case, the circuit court accepted and relied upon Guyton's concession in reaching its verdicts.

or had reason to know, that the five victims were "witnesses." In so arguing, he relies primarily on his own testimony. Specifically, he points to his testimony that although he anticipated working with CPS to regain custody of his child upon his release from incarceration, he believed all of the court proceedings in his son's CHIPS case were done based on that case's postdispositional status.

¶31 In its oral decision, however, the circuit court specifically found this portion of Guyton's testimony "implausible and not credible." The court supported this finding by pointing to the following testimony elicited from Guyton on cross-examination:

> [PROSECUTOR]: And you knew that where there's an objection, you would be able to—entitled to a hearing and it—there would have to be testimony related to that in order to justify or have a Court make a final decision, just like you were told in [a previous Department letter], right?
>
> [GUYTON]: Correct.

¶32 Based on this testimony, the circuit court made the reasonable inference that "Guyton himself knew that these people could be witnesses at some point. He had made objections, he was objecting to the way the situation with his son was handled, and that this could end up in a testimonial situation." Under our "highly deferential" standard of review, we must credit that inference. *Booker*, 292 Wis. 2d 43, ¶22.

¶33 Guyton also argues that our decision in *State v. Cotton*, 2003 WI App 154, 266 Wis. 2d 308, 668 N.W.2d 346, compels a conclusion that he did not know, or have reason to know, that the individuals he threatened were witnesses. We disagree.

¶34    In *Cotton*, the defendant was arrested for underage drinking. *Id.*, ¶3. While in a police department's booking room, an officer recognized Cotton as a potential witness in a homicide investigation in which Cotton's cousin was the primary suspect. *Id.*, ¶4. The officer subsequently informed Cotton that he was one of the officers who had served subpoenas on Cotton and his family. *Id.* Cotton then grew agitated and threatened to kill the officer and his children. *Id.*, ¶5.

¶35    The State ultimately charged Cotton with threats to a witness. *Id.*, ¶7. Following a preliminary hearing, Cotton moved to dismiss the charge on the ground that there was no evidence showing that the officer had attended, or was scheduled to attend, any proceeding in the homicide case as a witness. *Id.*, ¶8. The circuit court granted Cotton's motion, and we affirmed. We reasoned:

> There is nothing in the evidence identified by the State or in the record of the preliminary hearing that establishes Cotton's knowledge that [the officer] was likely to be a witness in an action or proceeding. [The officer] testified that Cotton expressed his anger with the service of the subpoenas on his family, claiming that the service had been invalid and that it had ruined his family. However, there is no indication that Cotton believed [the officer] might be a potential witness either in any case against him or in the homicide case pending against his cousin. Nowhere in the exchange between [the officer] and Cotton did Cotton make any reference that could be construed as evidence that he knew [the officer] was likely to be a witness. Evidence limited to the mere fact that Cotton was angry with [the officer], without more, does not establish that he threatened [the officer] and [the officer's] family because he knew that [the officer] was likely to be a witness for the State.

*Id.*, ¶22.

¶36    We conclude that the facts of this case are materially distinguishable from those in *Cotton*. Unlike in *Cotton*, where there was "no indication" that

13

Cotton knew that the officer might be a potential witness in a case against him or his cousin, Guyton made threats against five individuals he knew—as he acknowledged in his own testimony—were involved with his son's CHIPS case. He also knew, as explained above, that any objections he made in that case could result in a hearing at which testimony would be introduced.

¶37    Under these circumstances, the circuit court reasonably concluded that this situation was not one where Guyton "felt wronged in some general way; rather, he felt wronged in the context of a very specific judicial proceeding, with a specific case number and pleadings that was being investigated by a governmental body.  A reasonable person under those circumstances would believe that the victims might be witnesses."  Because the court's conclusion was reasonable, we must uphold it.  *See **Smith***, 340 Wis. 2d 710, ¶24.

*C.  Fourth element*

¶38    Finally, Guyton argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that Guyton threatened the victims because of their status as witnesses.  Again relying on ***Cotton***, he asserts that his threats were merely "angry comments," and therefore cannot be construed to be "an attempt to illegally meddle in a legal proceeding."

¶39    As a threshold matter, we first address the State's contention that the facts of this case relieved the State of its otherwise undisputed obligation to prove the fourth element[7] in order to secure a conviction under WIS. STAT. § 940.201(2).  According to the State, this conclusion follows because the causation element

---

[7] For the remainder of this opinion, we refer to this element as the "causation element."

14

"only applies when a victim has [already] attended or testified, and does not apply when the person is expected to be summoned to testify."

¶40     We are not persuaded by the State's contention because the primary legal authority upon which it relies—Note 6 to WIS JI—CRIMINAL 1238—offers no support for its position.  To explain, Note 6 does not state that the causation element does not apply when a victim has not yet testified.  To the contrary, it states, in relevant part:  "This element [i.e., the causation element] is drafted for a case where the person has attended or testified.  If that statement does not fit the status of the victim, the statement *must be modified*.  *See* note 4, supra."  ***Id.*** (emphasis added).    Thus, the plain language of Note 6 does not support a conclusion that the causation element need not be proven when a witness has not yet testified; it simply states that the language of the element must be modified to reflect the status of the potential witness.

¶41     Relatedly, the State also argues WIS. STAT. § 940.201(2)(a) "itself contains no requirement that the defendant threatened the victim *because* the victim was a witness."   In making its argument, however, the State ignores language in Note 6 to WIS JI—CRIMINAL 1238, which speaks squarely to this issue:  "The instruction uses 'because' in place of the statutory language 'by reason of ….'  The [Jury Instruction] Committee intended no substantive change and believed the instruction will be easier for a jury to understand if 'because' is used."  Given the State's failure to recognize—let alone meaningfully address—this portion of the very note it relies upon to argue that a causation element need not be proven, we decline to further consider its argument.  *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not consider undeveloped arguments).

15

¶42   Nonetheless, we agree with the State's alternative argument that there was sufficient evidence introduced at trial for the circuit court to conclude that the causation element was proven beyond a reasonable doubt.  In arguing to the contrary, Guyton once again ignores our standard of review by focusing solely on his view of the evidence presented at trial.

¶43   In Guyton's view, the evidence introduced at trial simply established that he "levied a threat because he was mad.  Because he was angry at [the Department's] decisions.  Because he was frustrated that he was incarcerated and was going to be unable to speak with his son.  Not because these women were witnesses."  Regardless of whether Guyton's view of the evidence is reasonable, we must affirm his conviction unless the evidence, viewed most favorably to the State, "is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."  *See **Booker***, 292 Wis. 2d 43, ¶22 (citation omitted).

¶44   Here, it cannot be said as a matter of law that no trier of fact, acting reasonably, could have found that Guyton threatened the victims because they were witnesses.  To determine otherwise would require us to disregard the circuit court's cogent explanation of its finding that Guyton did threaten the victims because they were witnesses:

> Mr. Guyton by his own admission made the threats because he felt his rights were violated or had been violated, that the [Department] was not doing the right thing. …
>
> I find beyond a reasonable doubt that a cause—one of the causes of Mr. Guyton's threats was the testimony and recommendations by [Ali] in the dispositional hearing.  It was not the only cause, but it was a cause.
>
> As for the others, I think Mr. Guyton's own testimony shows that he understood that his complaints or objections might be the subject of a court hearing.  Again, [the

> portions of Guyton's testimony quoted above] reflect that type of understanding.
>
> This testimony shows that he subjectively knew that they would be witnesses. It certainly was a reasonable thing for anyone in his position to think, at least in this Court's opinion. The others did not testify in the same way as [Ali], but … they do not have to do so to qualify as witnesses. There does not have to be a pending hearing, such as a scheduled permanency plan hearing or something like that. All that is required is these people have to have relevant information and be subject—that is, potentially be—witnesses.
>
> There is no question that these people fit that definition. Again, that is why Mr. Guyton singled them out, because they were the ones with the knowledge. They were the ones, in his opinion, who were harassing him by their actions.

Because Guyton's own testimony supports the court's finding, we defer to the court's finding, as we must. *See Smith*, 342 Wis. 2d 710, ¶24.

¶45    Guyton also makes a cursory argument that because Debra and Chloe testified that they did not believe Guyton made his threats because they could be witnesses against him, the record contained "evidence constituting clear reasonable doubt." Although this testimony was certainly relevant and supported Guyton's view of the case, it is not determinative. A finder of fact is entitled to "reject evidence and testimony suggestive of innocence." *State v. Poellinger*, 153 Wis. 2d 493, 503, 451 N.W.2d 752 (1990). In other words, the "trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason, reject that inference which is consistent with the innocence of the accused." *Id.* at 506 (emphasis omitted). For the reasons just explained, the circuit court's choice to infer that Guyton made his threats because the victims were witnesses was within the bounds of reason. We therefore affirm.

17

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.